Richard J. SANSEVERA, Plaintiff,

v.

E.I. DuPONT de NEMOURS
& CO., INC., Defendant.

No. 92 CIV. 6365 (MGC).

United States District Court,
S.D. New York.

Aug. 4, 1994.

Koob & Magoolaghan by Elizabeth L. Koob, New York City, for plaintiff.

Seward & Kissel by Michael J. McNamara, Valerie D. Ringel, New York City, for defendant.

*OPINION AND ORDER*

CEDARBAUM, District Judge.

Plaintiff Richard Sansevera, a former employee of DuPont Imaging Systems, a subsidiary of defendant E.I. DuPont de Nemours & Co., sues defendant pursuant to § 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a)(1)(B). Sansevera, who suffers from Chronic Fatigue Syndrome ("CFS"), seeks a declaratory judgment that he is eligible for benefits under DuPont's Total and Permanent Disability Income Plan, an award of benefits past due from August 2, 1990 to the present plus interest, and an order enjoining DuPont from improperly denying him benefits in the future. In addition, Sansevera seeks to recover attorney's fees and costs, pursuant to 29 U.S.C. § 1132(g)(1). DuPont's motion to strike Sansevera's request for punitive damages was granted by oral opinion in open court on February 26,

1993. (Tr. at 13.) DuPont and Sansevera now cross-move for summary judgment.

For the reasons discussed below, DuPont's motion for summary judgment is denied, and Sansevera's motion for summary judgment is granted in part and denied in part.

*The Facts*

The following facts, except where noted, are undisputed. On October 13, 1988, Sansevera, at the age of forty-five, began working as a Director of Marketing and Sales for Crosfield Electronics. (Def. 3(g) Stmt. at 3, ¶¶ 8, 9.) In February of 1990, Sansevera became ill. He reported symptoms of "terrible fatigue, dizziness, nausea, swollen glands, a low grade fever, and the inability to get out of bed, walk around or generally function." (Pl. 3(g) Stmt. at 3, ¶ 3.) He began receiving short-term disability benefits from Crosfield on February 2, 1990, and has since been diagnosed as suffering from CFS. (*Id.* ¶ 3, 4.) While Sansevera was on disability leave, Crosfield was acquired by DuPont. On July 1, 1990, Sansevera became an employee of DuPont Imaging Systems, and began receiving benefits equivalent to his full salary under DuPont's short-term disability plan. (Def. 3(g) Stmt. at 3–4, ¶¶ 12, 15, 16.) On August 2, 1990, Sansevera's six-month short-term disability period expired, at which time he applied to receive benefits under DuPont's Total and Permanent Disability Income Plan (the "Plan"). He continued to receive his full salary until August 31, 1990, when he was officially terminated. (Pl. 3(g) Stmt. at 4, ¶ 8.)

According to the Plan, determinations regarding eligibility for benefits are made by the Board of Benefits and Pensions (the "Board"). (Pl.Ex. 11, ¶ VIII(B).) The Plan provides that "[a]n individual shall be considered 'totally and permanently disabled' if the [Board] finds that he is totally disabled by injuries or disease and presumably will be totally and permanently prevented from pursuing any gainful occupation...." (*Id.* ¶ II(E).) In 1990, an initial review of applications for benefits under the Plan was conducted by the Case Determination Committee. (Hay Aff. ¶ 7.) This Committee was replaced in January of 1991 by a two-person initial review committee, comprised of Dr. Alan J. Hay, then Assistant Corporate Medical Director for DuPont and medical adviser to the Case Determination Committee, and George Hollodick, then a manager in the Pensions, Compensation and Benefits area. (Hay Aff. ¶ 7.) According to Herbert Watson, Benefits Consultant for DuPont, since Mr. Hollodick is not a doctor, his role was merely to "sign[ ] off" on Dr. Hay's determinations regarding medical eligibility. (Watson Dep. at 51–52.)

In accordance with standard procedure, after Sansevera applied to receive benefits under the Plan, he was examined by a DuPont physician, Dr. Michele Deltieure. In a report dated August 29, 1990, Dr. Deltieure stated that Sansevera had been diagnosed with CFS, but that his physical condition was within normal limits and that his prognosis was "good." (Pl.Ex. 13, ¶¶ 4, 5.) Dr. Hay, as medical adviser to the Case Determination Committee, was responsible for reviewing the medical information submitted in support of Sansevera's claim and making recommendations to the Committee concerning his eligibility. (Hay Aff. ¶ 3.) After reviewing Dr. Deltieure's report and another report which showed that a brain scan had revealed no abnormalities, Dr. Hay concluded: "Prognosis for life is good. Prognosis for change in behavior is uncertain. Prognosis for performing the activities of work is good." (Pl. Ex. 13.) In his affidavit, Dr. Hay states that this conclusion was also supported by literature on CFS which suggested that "patients seemed to improve over time," and the fact that no medical study has proven that CFS is a permanent condition. (Hay Aff. ¶ 10.)

In a letter dated September 18, 1990, before the Case Determination Committee had met to review his application, Sansevera was notified that "[t]he initial determination was that you did not qualify for coverage under the DuPont Total and Permanent Disability Plan." (Pl.Ex. 17.) DuPont contends that this letter was sent by mistake, and that Sansevera's application was given full and fair consideration by the Committee. (Def. 3(g) Counter–Stmt. ¶ 9.) The Committee reviewed Sansevera's application in October of 1990, and tabled its decision "pending the

results of an independent third-party evaluation of his physical condition." (Pl. Ex. 18.) No such evaluation was ever undertaken. Instead, Dr. Hay recommended that Sansevera be evaluated by a psychiatrist to determine if he could qualify for benefits under the Plan on the basis of his depression. (Hay Aff. ¶ 12.) Dr. Daniel W. Schwartz, a forensic psychiatrist, examined Sansevera, and in a letter dated December 8, 1990, concluded that he "is not suffering any impairment of his ability as marketing manager as a result of mental disease or defect." (Pl.Ex. 19.) Dr. Schwartz also noted that "[t]he physical symptoms themselves of [CFS] are enough to render such impairment." (*Id.*)

In support of his application, Sansevera submitted to the Committee an evaluation by Dr. Susan M. Levine, who had had extensive experience with CFS patients and, in 1990, was one of thirteen physicians appointed to serve on a committee organized by the Center for Disease Control to study CFS. (Levine Aff. ¶¶ 2, 3.) In a letter dated January 25, 1991, Dr. Levine reported that Sansevera's "symptoms, physical exam and laboratory studies, in addition to the lack of any evidence for any other concurrent illness point[ ] to a firm diagnosis of the Chronic Fatigue Syndrome." (Pl.Ex. 23 at 1–2.) She concluded that Sansevera "remains totally and permanently disabled." (*Id.* at 2.)

Sansevera also submitted a report dated January 8, 1991, by Dr. R.J. Romano, who had been treating him since March of 1990. Dr. Romano diagnosed Sansevera as suffering from CFS, and reported that his "prognosis for recovery is guarded and I believe that he will suffer from this condition for a prolonged period of time which means multiple years, if not for the rest of his life." (Pl.Ex. 24 at 2.) In response to a questionnaire sent by DuPont, which asked, "Are [Sansevera's impairments] temporary, or are they expected to be permanent?," Dr. Romano wrote "permanent," as he did in response to the question, "If not presently capable of performing [work activities], for how long?" (Hay Aff. Ex. F.) On the back of the questionnaire, Dr. Romano added that his opinion of permanency was based on the "severity and duration" of Sansevera's condition. (*Id.*)

After reviewing these additional reports, Dr. Hay and Mr. Hollodick concluded that there was insufficient medical evidence to support a finding that Sansevera was "totally and permanently disabled" within the meaning of the Plan. (Hay Aff. ¶ 18; Pl.Ex. 26.) Although Dr. Hay and Mr. Hollodick acknowledged that Drs. Levine and Romano had stated that Sansevera's condition would be permanent, they did not recommend that he be awarded benefits because neither doctor "present[ed] any supporting information or test results to demonstrate measurable impairment of the immune system or any other organ system." (Pl.Ex. 26.) In a letter dated February 27, 1991, Sansevera was notified that his claim had been rejected because he was not considered to be "permanently incapacitated" by his CFS, and he was advised that he had the right to appeal the decision to the Board. (Pl.Ex. 27.)

Sansevera exercised his right to appeal, and submitted additional medical opinions in support of his application. In a letter dated May 2, 1991, Dr. Perry A. Orens reported that "laboratory evaluation of the so-called Levy panel revealed significant abnormalities which are consistent with the diagnosis of [CFS]. Prognosis is extremely guarded. He is totally disabled by both the severe fatigue, but also the severe cognitive dysfunction which is so prevalent in this disorder. He cannot perform any work at all." (Hay Aff. Ex. I.) In a letter dated January 31, 1991,[1] Dr. Marianne Frieri, an allergist, stated that "[m]y prognosis for recovery is unknown.... Expected to be permanent.... Incapable of performing marketing manager activities...." (*Id.* Ex. H.) Dr. Levine submitted an additional report, dated April 12, 1991, in which she stated that treatment had thus far been unsuccessful and concluded that "[b]ecause of his severe physical and mental incapacity I believe that Mr. Sansevera is

1. This letter was not received in time for the initial review of Sansevera's application, but Dr. Hay stated that he later read it and found that it did not change his recommendation. It was reconsidered on appeal, along with all of the other medical reports. (Hay Aff. ¶ 19, 20.)

completely and permanently disabled." (*Id.* Ex. I.)

After reviewing the additional information and concluding that there was still no objective evidence on which to base a finding of permanent disability, Dr. Hay recommended to the Board that Sansevera's appeal be denied. (Hay Aff. ¶ 20.) On June 14, 1991, the Board considered Sansevera's appeal and concluded that there was "[n]o medical evidence [that] was presented to support a conclusion that Mr. Sansevera was 'totally and permanently' prevented from performing the activities of work at the time of his termination." (Pl.Ex. 31 at 3.)

Before Sansevera was notified of the Board's determination, Dr. Hay received letters from two additional doctors. Dr. James N. Crovello, a psychiatrist, reported that Sansevera's "illness has exceeded twelve months in duration. He still remains unable to work. It is still because of his [CFS] and its associated depressive symptoms. It is my opinion that he will eventually recover. However, this may take anywhere from several more months to a few years." (Hay Aff. Ex. J.) In an affidavit, Dr. Crovello states that his opinion regarding Sansevera's eventual recovery was in reference to his depression, the only ailment for which he was treating Sansevera, and not in reference to his CFS. (Crovello Aff. ¶¶ 5, 6.) Dr. Daryl Di Dio, a clinical psychologist, performed a battery of tests on Sansevera and, in a report dated April of 1991, stated that his "deficits in attention and concentration have severely affected his performance, as his present performance is not consistent with his potential." (Hay Aff. Ex. J.) Dr. Di Dio concluded that Sansevera "is unable to function in a competitive employment situation." (*Id.*) After reviewing these additional reports, Dr. Hay concluded that there was no reason to reconvene the Board for reconsideration. (Hay Aff. ¶ 23.) In a letter dated August 19, 1991, Sansevera was advised that the Board had denied his appeal, having found that "[t]here is no objective medical information which indicates impairment of functional immunity, neurological dysfunction nor impairment of any major organ system." (Pl. Ex. 38.)

On August 24, 1992, Sansevera filed this suit, challenging the Board's definition of a "total and permanent" disability, and the Board's refusal to accept CFS as a qualifying disability. Sansevera contends that the Board's decision to deny him benefits must be reviewed de novo, but that the decision should be overturned even under the more deferential arbitrary and capricious standard of review. DuPont argues that an arbitrary and capricious standard of review is required and that the Board's decision was reasonable in light of the terms of the Plan and the Board's treatment of other applicants diagnosed with CFS.

*Discussion*

■ Summary judgment is authorized when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). In examining the record, the court "must resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party." *Gibson v. American Broadcasting Cos., Inc.,* 892 F.2d 1128, 1132 (2d Cir. 1989); *see Celotex,* 477 U.S. at 330 n. 2, 106 S.Ct. at 2556 n. 2. The judge's role in summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

I. *Standard of Review*

■ The Supreme Court, in *Firestone Tire and Rubber Co. v. Bruch,* 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), held that "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a de novo standard unless the benefit plan gives the administrator ... discretionary authority to determine eligibility for benefits or to construe the terms of the plan[,]" in which case the deferential arbitrary and capricious

standard is appropriate. 489 U.S. at 115, 109 S.Ct. at 956.

DuPont's Plan states that "[a]n individual shall be considered 'totally and permanently disabled' *if the Board of Benefits and Pensions finds* that he is totally disabled by injuries or disease and presumably will be totally and permanently prevented from pursuing any gainful occupation...." (Pl.Ex. 11, ¶ II(E)) (emphasis added). In addition, the Plan states that "[s]atisfactory medical evidence must be provided on which *the Board may base a finding* that an individual is totally and permanently disabled." (*Id.* ¶ VI(A)) (emphasis added). Finally, the Plan provides the following:

> VIII. ADMINISTRATION OF THE PLAN
>
> A. The Executive Committee of the Company shall have the authority to control and manage the operation and administration of this Plan....
>
> B. The administration of this Plan is vested in the Board of Benefits and Pensions appointed by the Executive Committee. The Board may adopt such rules, or delegate to one or more persons its authority to make initial determination [sic], as it may deem necessary for the proper administration of the Plan. The *decision of the Board in all matters involving the interpretation and application of this Plan shall be final.*

(*Id.* ¶ VIII(B)) (emphasis added).

DuPont argues that the emphasized language above demonstrates that the Plan gives the Board discretion to determine eligibility for benefits and final authority to interpret the terms of the Plan, as required by *Firestone,* and that the Board's decision may therefore be overturned only if it is found to be arbitrary and capricious. Sansevera argues that the Plan does not provide a clear grant of discretion to the Board to interpret the terms of the Plan, and that its decision to deny him benefits must therefore be reviewed de novo.

Sansevera relies on *Guisti v. General Electric Co.,* 733 F.Supp. 141 (N.D.N.Y.1990), in which Judge McCurn reviewed de novo a decision by a third-party insurance company, which administered an insurance plan on behalf of General Electric's employees, to deny the plaintiff benefits under its accidental death policy. The plan in *Guisti* stated that the plan administrator, as opposed to the employer, "will make all determinations with respect to benefits under this Plan," but did not expressly state that the administrator had discretion to interpret the terms of the plan or that eligibility determinations made by the administrator were to be given deference. 733 F.Supp. at 146. Sansevera argues that, like the provision in *Guisti,* paragraph VIII(B) merely states that the Board, as opposed to the Executive Committee, has the final authority within DuPont to interpret the terms of the Plan. Sansevera argues further that the Plan does not explicitly provide that any interpretation made by the Board would be binding on the court.

This reading of paragraph VIII(B), however, strains its plain language, which explicitly states that the Board has the final authority to interpret and apply the terms of the Plan. Other provisions in the Plan support this reading. As the language emphasized above makes clear, paragraph II(E) provides that a finding of a "total and permanent" disability is left to the discretion of the Board. In addition, paragraph VI(A) states that the Board "may" decide whether an applicant is totally and permanently disabled, based on the medical evidence presented. The language in these provisions sharply contrasts with the language in a benefit plan found by the Second Circuit to leave the administrator no room for discretion. *See Heidgerd v. Olin Corp.,* 906 F.2d 903, 908–09 (2d Cir.1990) (applying de novo standard of review in light of plan's language, which provided that "*You will receive* severance pay if you are dismissed ..." and "*Benefits are payable* if you must resign because of ill health.") The language of the Plan therefore satisfies the *Firestone* test, and the Board's denial of benefits to Sansevera must be reviewed under the arbitrary and capricious standard.

█ Sansevera argues that, even if the terms of the Plan grant the Board discretion, de novo review is still required for two reasons. First, Sansevera argues that the terms of the Plan do not control because the

Plan Summary, which according to Sansevera does not grant the Board discretion, did not notify the employees that the terms of the Plan govern. DuPont, however, has since produced two additional pages of the Plan Summary which had been "inadvertently redacted" in the document produced to Sansevera in discovery. (Koob Reply Aff. Ex. 54.) One of the two missing pages states that "[t]his summary plan description is intended to provide you with a reasonably thorough explanation of the disability plans. Wherever possible, nontechnical language has been used to explain plan provisions. The official plan texts are the governing documents in the event questions arise." (*Id.*) Sansevera argues that in any event the Plan Summary itself should have informed employees of the discretion granted to the Board. However, it is not necessary for a plan summary to restate each term of a benefit plan because such a requirement would defeat the summary's purpose of providing a clear and concise description of the employees' rights and obligations under the plan. *Cf. Pompano v. Michael Schiavone & Sons, Inc.*, 680 F.2d 911, 914 (2d Cir.), *cert. denied*, 459 U.S. 1039, 103 S.Ct. 454, 74 L.Ed.2d 607 (1982) (plan summary need not enumerate factors to be considered by the administrator because "such a requirement would defeat the purpose of a summary, i.e., a brief restatement").

Second, Sansevera argues that he was never informed of the difference in coverage provided by Crosfield's disability plan, which covered "long-term" disabilities, and that of DuPont, which DuPont claims covers only "permanent" disabilities. According to the Supreme Court in *Firestone*, the terms of the Plan control the determination of the appropriate standard of review. 489 U.S. at 115, 109 S.Ct. at 956. Whether Sansevera was notified of the change in benefits cannot affect this determination. DuPont states that, in any event, it was entitled to provide different coverage for its employees than was provided under Crosfield's plan, *see Reichelt v. Emhart Corp.*, 921 F.2d 425, 430 (2d Cir. 1990), *cert. denied*, 501 U.S. 1231, 111 S.Ct. 2854, 115 L.Ed.2d 1022 (1991), and that all employees were informed that there were differences in coverage. (Pl.Ex. 7.)

The Board's decision to deny Sansevera's application for benefits under the Plan will therefore be reviewed under the arbitrary and capricious standard.

## II. *Was the Board's Decision Arbitrary and Capricious?*

The Supreme Court has stated that:

> "Under the 'arbitrary and capricious' standard the scope of review is a narrow one. A reviewing court must 'consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.... Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one....' "

*Bowman Transportation, Inc. v. Arkansas–Best Freight System, Inc.*, 419 U.S. 281, 285, 95 S.Ct. 438, 440, 42 L.Ed.2d 447 (1974) (quoting *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 823–24, 28 L.Ed.2d 136 (1971)). Thus, in reviewing the Board's denial of benefits, "[a]bsent a showing of bad faith or arbitrariness, the court will not disturb [its] interpretations of [the] plan as long as they are consistent with the plan's terms and purpose." *Seff v. NOI-TU Insurance Trust Fund*, 781 F.Supp. 1037, 1040 (S.D.N.Y.1992). The fact that the Plan is funded by DuPont raises a potential conflict of interest in the Board's decision to deny Sansevera's application, and therefore will be considered in deciding whether the Board acted arbitrarily or capriciously. *See Firestone*, 489 U.S. at 115, 109 S.Ct. at 956.

Sansevera argues that the Board's decision to deny his application was arbitrary and capricious for three reasons: (1) the Board failed to consult with an expert on CFS; (2) the Board's definition of a total and permanent disability is unreasonable; and (3) the Board has not applied its definition consistently.

### A. *Failure to Consult With An Expert*

First, Sansevera contends that the Board acted arbitrarily and in bad faith by accepting Dr. Hay's recommendation that CFS not be recognized as a qualifying disease, since Dr. Hay, who had had no personal

experience in diagnosing or treating CFS, had not consulted with an expert on CFS. Sansevera relies on *Kunin v. Benefit Trust Life Ins. Co.,* 910 F.2d 534 (9th Cir.), *cert. denied,* 498 U.S. 1013, 111 S.Ct. 581, 112 L.Ed.2d 587 (1990), in which the Ninth Circuit found that the medical adviser to a plan administrator acted arbitrarily and capriciously in determining that autism is a mental disease, by failing to consult with doctors with any "significant experience with or particular expertise concerning autism" and by making "no effort to discuss the matter with [plaintiff]'s physicians." 910 F.2d at 538. Sansevera argues that Dr. Hay similarly failed to consult with any independent expert on CFS, or make any effort to contact Sansevera's experts, and therefore had no basis for questioning their opinions. Sansevera contends that his doctors based their opinions on the best information available for diagnosing CFS, and provided objective evidence to support their conclusions.

DuPont defends its action on the ground that Sansevera's application was not supported by "objective medical information which indicates impairment of functional immunity, neurological dysfunction nor impairment of any major organ system." (Watson Aff. Ex. I.) DuPont contends that its good faith is evidenced by the fact that it sent Sansevera to a psychiatrist in an effort to determine whether his depression would allow him to qualify under the Plan as totally and permanently disabled. Although Sansevera never claimed that he was disabled by depression, DuPont states that this approach was reasonable since a previous applicant who allegedly suffered from CFS was able to qualify under the Plan on the basis of her depression.

However, by ignoring expert opinions regarding the diagnosis and treatment of CFS, it is clear that DuPont acted arbitrarily and capriciously in reviewing Sansevera's application. The National Institute of Health, in a pamphlet on CFS published for physicians, states that CFS is difficult to diagnose because of its "nonspecific symptoms," including "debilitating fatigue and flu-like symptoms such as pharyngitis, adenopathy, low-grade fever, myalgia, arthralgia, headache,

difficulty concentrating, and exercise intolerance." (Pl.Ex. 1 at 1.) The pamphlet further states that CFS cannot yet be conclusively diagnosed through any specific laboratory test, and that physicians attempting to diagnose CFS should look for the above symptoms, and perform tests to exclude other possible causes for these symptoms. (*Id.* at 5–6; 12–15.) According to her January 25, 1991 report, Dr. Levine conducted this kind of analysis, and concluded that Sansevera suffered from CFS. (Pl.Ex. 23 at 1–2.) In addition, Dr. Orens reported that "laboratory evaluation of the so-called Levy panel revealed significant abnormalities which are consistent with the diagnosis of [CFS]." (Hay Aff. Ex. I.) Although Dr. Hay admitted that he was not familiar with the "Levy panel," he did not consult with an expert on CFS, nor did he question Dr. Orens about the test. (Hay Dep. at 99.) It appears that Dr. Hay simply decided that CFS would not be considered a qualifying illness, regardless of any expert opinions Sansevera offered to the contrary.

In its reply memorandum, DuPont states that "chronic fatigue was, and continues to be, an affliction of unknown cause, difficult to diagnose and an enigma to the medical community." (Def.Reply Mem. at 15.) While this may be true, this cannot provide a reasonable basis for ruling out CFS as a total and permanent disability under the Plan. When confronted with an illness that is admittedly difficult to diagnose, it is unreasonable to demand evidence of a specific kind of impairment after experts have concluded that no definitive test for CFS has yet been discovered. Moreover, it is unreasonable to ignore the expert opinions of doctors who, using the best available method of diagnosing the illness, have concluded that Sansevera suffers from a drastically debilitating disease.

Dr. Hay, who has no expertise in diagnosing or treating CFS, could not provide the Board with a competent opinion regarding Sansevera's disability. In light of his apparent skepticism regarding Sansevera's expert opinions, Dr. Hay should have sought the opinion of an independent expert on CFS. Even assuming that DuPont's decision to have Sansevera examined by a psychiatrist

was reasonable, DuPont offers no explanation for its decision not to have Sansevera examined by a doctor familiar with CFS.

B. *Reasonableness of DuPont's Definition*

Second, Sansevera contends that the Board's interpretation of the Plan's definition of a "total and permanent" disability is unreasonably restrictive and renders the Plan meaningless. The Plan states that "[a]n individual shall be considered 'totally and permanently disabled' if the Board ... finds that he is totally disabled by injuries or disease and presumably will be totally and permanently prevented from pursuing any gainful occupation...." (Pl.Ex. 11, ¶ II(E)) According to Dr. Hay, this definition requires a finding "that the employee was totally incapable of pursuing significant employment, and that the disability was expected *with medical certainty* to be lifelong." (Hay Aff. ¶ 4) (emphasis added). Sansevera contends that this definition of "total and permanent" is unreasonable on its face, as well as in the context of the Plan as a whole.

Sansevera argues that this definition of a total and permanent disability is inherently unreasonable because no disability can be determined with "medical certainty" to be permanent. Dr. Roger J. Pomerantz, DuPont's own medical expert,[2] stated that he was confused by DuPont's definition of "total and permanent," which he understood to mean "no chance for recovery," because he believed that with "any illness there is a chance for recovery." (Pomerantz Dep. at 156.) He stated further that "nothing is permanent a hundred percent of the time" and that "total and permanent ... is an anachronistic phrase in medicine and should have no meaning in disability claims." (*Id.* at 160.) This opinion is shared by Sansevera's experts. *See* Levine Aff. ¶ 13 ("[I]t is my opinion that there are few if any medical illnesses which could be said with absolute medical certainty to be disabling lifelong."); Crovello Aff. ¶ 8 ("[I]t is my opinion that there are no psychiatric illnesses which could be said with medical certainty to be lifelong disabling.")

DuPont responds by noting that, as of March of 1993, more than two thousand people had been deemed eligible for benefits under the Plan, and that, therefore, its definition of a total and permanent disability is not impossible to satisfy. (Def. 3(g) Statement ¶ 7.) DuPont contends that what Sansevera is really arguing for is a definition that encompasses "long-term" disabilities, rather than exclusively "total and permanent" disabilities as provided for in the Plan. DuPont contends that Sansevera's application was denied because his experts were inconsistent in their opinions regarding permanency, and because none of the opinions satisfied the requirement of "medical certainty." DuPont also points to a letter from Sansevera dated October 2, 1990 to the Chairman of the Board and Chief Executive Officer of DuPont, in which he stated that "I'm seeing three different doctors and all of them have told me that they are optimistic that I will fully recover but it will take time." (Watson Aff.Ex. F at 105049.) DuPont argues that Sansevera's letter casts doubt on the honesty of his doctors' opinions that his disability will be permanent.

While DuPont correctly notes that Sansevera did not submit any reports that concluded with medical certainty that his CFS would be lifelong, and that certain reports conclude that his disability will be permanent while others do not, this does not provide a reasonable basis for the denial of benefits. On the contrary, it serves to highlight the unreasonableness of DuPont's requirement that an applicant demonstrate with medical certainty that a disability will be permanent. This is especially true in the case of an applicant diagnosed with CFS, in light of the fact that there is currently no method of determining whether a person will ever recover from CFS, nor is there any treatment that has been proven effective in overcoming this illness. *See* Pl.Ex. 1 at 5, 9–11. Because Sansevera has been suffering from CFS since February of 1990 and has not shown

2. Dr. Pomerantz did not examine Sansevera, and served as DuPont's expert for the purposes of this lawsuit only.

any sign of improvement, it is unreasonable to deny him benefits simply because he cannot prove with medical certainty that he will never recover.

Sansevera also contends that the Board's definition of total and permanent is arbitrary and capricious because it is not "fair and reasonable in the context of the entire plan." *DeAngelis v. Warner Lambert Co.,* 641 F.Supp. 467, 470 (S.D.N.Y.1986). The Plan provides that payments "will end with the month in which the individual dies *or is found to be no longer totally and permanently disabled.*" (*Id.* ¶ VII(A)) (emphasis added). Sansevera argues that a definition of "total and permanent" cannot possibly require a showing of medical certainty because the Plan itself contemplates that an applicant might recover. DuPont states that this provision is simply an added precaution in case an employee with a disability that was thought to be permanent should happen to recover.

However, certain provisions in the Plan Summary suggest that Sansevera's reading is more reasonable. On the front page of the Plan Summary, there is a brief description of the "Total and Permanent Disability Income Plan," which states: "For occupational and nonoccupational disabilities, benefits begin the month following your termination due to total and permanent disability. Benefits *may continue for life, as long as you remain disabled.*" (Ex. 8 at 102002) (emphasis added). This is reiterated several pages later: "[Total and Permanent] benefits *may continue for life or until you're no longer totally and permanently disabled.*" (*Id.* at 102010) (emphasis added). This language does not suggest that a total and permanent disability under the Plan is one that requires medical certainty of lifelong duration.

Rather, this language suggests a definition of total and permanent that would encompass illnesses that endure beyond the period provided for short-term disabilities and, based on the best available medical information, are likely to continue for the foreseeable future. Therefore, DuPont's requirement that Sansevera demonstrate with medical certainty that he will permanently suffer from CFS is both unreasonable on its face, and in the context of the entire Plan.

C. *Consistency of DuPont's Application*

■ Finally, Sansevera argues that the Board's decision was arbitrary and capricious because its definition of total and permanent, even if found to be reasonable, has not been "uniformly applied in similar situations." *DeAngelis,* 641 F.Supp. at 470. Sansevera contends that other applicants, including one who had been diagnosed with CFS, have not been required to demonstrate with medical certainty that their disabilities would be lifelong.

In September of 1989, an employee of DuPont, "Jane Doe," who had been diagnosed with CFS, was approved for benefits because she was "totally and permanently disabled by depression within the meaning of the Plan." (Hay Aff. ¶ 24.) After having initially been denied benefits on the basis of her CFS, Jane Doe was evaluated by Dr. Nicholas E. Stratas, a psychiatrist, to determine whether her application could be approved on the basis of her depression. In a report dated August 7, 1989, Dr. Stratas stated that Jane Doe complained of having " 'hardly any energy,' difficulties motorically, difficulties with memory and concentration, difficulties doing the simplest tasks around the house, [and an] aversion to being out in public or with others." (Pl.Ex. 43 at 2.) It is unclear from the report what laboratory tests, if any, he conducted, but Dr. Stratas reported that "[e]ven if we were to discount the chronic fatigue syndrome there are innumerable medical events including neurological and febrile presentations." (*Id.* at 1.) He concluded that she was "incapable of pursuing any ... gainful employment *at this time.* I do not see that her recovery or improvement is likely *for the foreseeable future.*" (*Id.* at 2–3) (emphasis added).

Based on Dr. Stratas' report, Dr. Hay recommended that her application for benefits under the Plan be approved, stating: "Prognosis for life is good. Prognosis for improvement is uncertain. Based on available information, including the reports of N.E. Stratas, ... it is apparent that psychological factors and psychiatric impairments

preclude performing the activities of work on a reliable basis *for the foreseeable future.* Recommend annual review by department *to determine if condition remains sufficiently dysfunctional* to prevent employment." (Pl. Ex. 43) (emphasis added). Jane Doe's file was reviewed the following year, at which time the Case Determination Committee reported that her "physical condition continues to worsen and the prognosis for future improvement is not good." (*Id.*) The Committee recommended that Jane Doe's eligibility be reevaluated the following year. (*Id.*)

DuPont contends that Dr. Stratas' August 7, 1989 report provided objective evidence of a total and permanent disability. (Def. Reply Mem. at 17.) But, as Sansevera points out, neither Dr. Stratas nor Dr. Hay concluded that Jane Doe's condition would with "medical certainty" be permanent. On the contrary, both doctors used the term "foreseeable future" to describe the duration of her disability. Moreover, the fact that Dr. Hay recommended that Jane Doe's file be reviewed each year demonstrates that he did not consider her condition to be permanent, as he now defines that term.

Sansevera also contends that the Board's strict interpretation of the terms total and permanent has not been consistently applied to other illnesses. After reviewing a list of disabilities for which DuPont has approved total and permanent disability benefits under the Plan, which includes migraines, tendinitis, asthma, and depression, both Drs. Levine and Crovello opined that the Board could not have applied the same requirement of "medical certainty" in evaluating those applications. *See* Levine Aff. ¶¶ 19, 20; Crovello Aff. ¶¶ 10, 11.

DuPont responds by stating that neither Dr. Levine nor Dr. Crovello "reviewed the evidence submitted on behalf of the applicants to ascertain whether and to what extent they were disabled or to determine the impact of the disability on the applicant's ability to pursue 'gainful employment.'" (Def. Reply Mem. at 17.) While it is true that DuPont did not produce the complete files of these other applicants, the point these doctors make is a reasonable one: the requirement that Sansevera demonstrate with medical certainty that his disability will be lifelong is inherently unreasonable and could not have been satisfied by these other applicants. Indeed, as DuPont's own expert stated, very few, if any, disabilities can be said to have no chance for recovery. In any event, DuPont did produce the complete file on Jane Doe's application, and it is clear from the reports included therein, as well as from the Board's decision to conduct an annual review of her case, that the Board has not been consistent in applying its requirement of medical certainty.

For the foregoing reasons, the decision by DuPont's Board of Benefits and Pensions to deny benefits to Sansevera under the Plan was arbitrary and capricious.

III. *Attorney's Fees and Costs*

Sansevera seeks to recover attorney's fees and costs, pursuant to 29 U.S.C. § 1132(g). This section provides as follows:

> In any action under this chapter ... by a participant, beneficiary, or fiduciary, the court in its discretion may allow a reasonable attorney's fee and costs of action to either party.

29 U.S.C. § 1132(g). The Second Circuit has held that the following five factors should be considered in deciding whether to grant an award under § 1132(g):

> (1) the degree of the offending party's culpability or bad faith;
>
> (2) the ability of the offending party to satisfy an award of attorney's fees;
>
> (3) whether an award of attorney's fees would deter other persons from acting similarly under like circumstances;
>
> (4) the relative merits of the parties' positions; and
>
> (5) whether the action conferred a common benefit on a group of pension plan participants.

*Chambless v. Masters, Mates & Pilots Pension Plan,* 815 F.2d 869, 871 (2d Cir.1987).

Without consulting an expert on CFS, the Board simply adopted Dr. Hay's refusal to recognize CFS as a serious medical condition, and thereby failed fully and fairly to consider Sansevera's claim. Although the

Board initially tabled its decision in order to seek the opinion of an independent third-party physician concerning Sansevera's physical condition, no such examination was ever undertaken. Furthermore, the Board adopted an unreasonably restrictive definition of "total and permanent" disability, which had not previously been applied. This suggests a questionable attempt to justify a decision to deny Sansevera's application, rather than a sincere effort reasonably to interpret the Plan.

As a result of the Board's actions, Sansevera was forced to bring this suit in order to receive the fair consideration to which he is entitled. An award of attorney's fees and costs is necessary both to relieve Sansevera of the financial burden undertaken to pursue this action, and to deter other employers from similarly denying an applicant a fair consideration of his or her claim.

In order to set a reasonable award of attorney's fees and costs, Sansevera should submit time records which reflect both the hours spent by his attorney and the particular work performed in connection with this action.

*Conclusion*

Because DuPont acted arbitrarily and capriciously in denying Sansevera's benefits under the Plan, DuPont's motion for summary judgment is denied. This case is remanded to DuPont's Board of Benefits and Pensions for the prompt reconsideration of Sansevera's application in accordance with this opinion. Sansevera's motion for summary judgment is therefore granted in part and denied in part.

SO ORDERED.